# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

RITA MORGAN,                :
                            :
     Plaintiff,         :      Civil Action No. 3:08-cv-249-FLW
                            :
                            :
         v.              :
                            :
COMMUNICATION WORKERS OF    :
AMERICA, AFL-CIO, DISTRICT 1;   :
VERIZON NEW JERSEY INC.        :
                            :       **OPINION**
     Defendants.       :
                            :
_____ :

**WOLFSON, United States District Judge**:

Presently before the Court are separate Motions for Summary Judgment brought by Defendants Communication Workers of America, AFL-CIO, District 1 ("CWA") and Verizon New Jersey Inc. ("Verizon")  to dismiss Plaintiff Rita Morgan's ("Plaintiff") Complaint.  In turn, Plaintiff also moves for Summary Judgment.  In her Complaint, Plaintiff alleges: (1) the CWA failed to adequately represent her during an arbitration hearing, held to determine whether Plaintiff's termination of employment was proper under her employment agreement and the Collective Bargaining Agreement ("CBA"), in violation of § 301 the Labor Management Relations Act ("LMRA"); (2) Verizon wrongfully terminated her employment; and (3) Verizon failed to produce critical witness statements to the CWA .  For the reasons that follow, the Court grants Verizon's and the CWA's Motions for Summary Judgment, and denies Plaintiff's Motion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a former Verizon employee.  For over twenty-four years, between 1981 and November 1, 2005, Plaintiff served as a consultant for Verizon, answering customer phone calls, selling products and services, and placing orders at a Verizon call center located in Hamilton, New Jersey.  Def. Verizon's Statement of Material Facts Not in Dispute Pursuant to L. Civ. R. 56(1)("Verizon's SOF")  ¶1.  As a Verizon employee, Plaintiff was a member of the CWA and was subject to the terms and conditions of the CBA between Verizon and the CWA. Id. ¶2.

Plaintiff alleges that on July 22, 2005, she overheard one of her co-workers, Carlton Evans, an African-American male, use the word "nigger" loudly in a conversation with another co-worker, forcing Plaintiff to cover her phone so the customer with whom she was speaking could not hear Evan's comments.  Pl.'s Compl. ¶6. Shortly thereafter, Plaintiff reported the incident to Erica Kelly, Call Center Manager.  Id. ¶7.  As a result, Evans was forced to participate in a coaching discussion for inappropriate language in the workplace.  Id. ¶9.  However, Evans was never referred to EEO for the incident; at which point, Plaintiff filed a report with the EEO documenting the incident.  Id. ¶10. In a separate incident, on August 12, 2005, Plaintiff's supervisor, Ferne Walker, an African-American female, suspended Kathleen LoPresti, a white female, and Plaintiff's co-worker and friend, for ten days, due to customer mistreatment. Verizon's SOF ¶4.

 In light of what Plaintiff perceived to be disparate treatment, Plaintiff told another co-worker, Tammy Jones, that she did not believe Lopresti's suspension was fair.  Pl.'s Compl. ¶12. Specifically, Plaintiff took issue with Evan's use of the word "nigger" and how Evans received a rather lenient disciplinary measure in light of the severity of the conduct.  Id.  At this point, some of Plaintiff's co-workers overheard Plaintiff's use of the word "nigger." Verizon's SOF ¶6;

2

Certification of Mary Rogers ("Rogers Certif."), Exh. 7, p. 112:5-14; 239:20-25.   Plaintiff

contends that she merely repeated what Evans said to Jones. Pl.'s Compl. ¶12.   However,

Keshon Bennet and Chuck Basich, two Verizon employees, reported hearing Plaintiff refer to

Walker as "a real nigger."  Verizon's SOF ¶7; Rogers Certif., Exh. 7, p. 98:25; 99:2-4; 100:4-25;

101:3-4; 111:18-25; 112:1-15.  In fact, Basich sent an instant message to his team leader Tamara

Congleton which stated: "RITA WAS JUST OVER HERE MAKING RACIAL SLURS

BECAUSE HER BUDDY GOT SUP FOR 10 DAYS AND J ONLY GOT A WEEK. . . .SAID

THAT FERNE IS 'THE N WORD'. . .BECAUSE CATHLEEN AND HER R WHITE THEY

GET HARASSED." Verizon's SOF ¶8; Rogers Certif., Exh. 16 (emphasis in original).

Eventually, Plaintiff's conduct was reported to Kelly who in turn contacted Verizon's EEO

Compliance office.   Verizon's SOF ¶¶9-10.  Bennett also overheard Plaintiff refer to Walker as a

"real nigger" and reported the conduct  o his team leader, Chris O'Brien, on August 13, 2005. Id.

¶13.

On August 30, 2005, Wanda Jenkins, EEO Compliance Senior Staff Consultant, began to

investigate the situation and interviewed Congleton, O'Brien, Bennett, Basich, and Jones. Rogers

Certif., Exh. 6, p. 60:2-12.  In addition, Jenkins informed the CWA representative for Verizon to

"be on standby in the event that witnesses want union representation with them as well."

Verizon's SOF ¶15.  On August 31, 2005, Plaintiff was informed by Congleton to see her union

representative. Pl.'s Compl ¶16.  Plaintiff spoke with a CWA representative, Amy Lafferty.  At

that point, Lafferty accompanied Plaintiff to a conference room where Plaintiff was to meet with

management.  Id.  What transpired during the meeting is in dispute.  Plaintiff alleges that Jenkins

conducted the meeting as an interrogation, informing Plaintiff that Lafferty was not to speak or

interrupt the interview in any way. Id. ¶¶17-18.   In addition, Plaintiff alleges that Jenkins screamed at her on several occasions, calling her a liar.  Id.  Verizon contends that Jenkins presented the accounts of Plaintiff's co-workers who overheard Plaintiff's conversation and that Plaintiff stated that if she did use the word "nigger," it was in order to repeat what Evans had said and was not in reference to her supervisor.  Verizon's SOF ¶20.  Lafferty was present throughout the entire interview except at one point when Lafferty was asked by Plaintiff to leave the room. Id.  Plaintiff alleges that after she asked Lafferty to leave the room, Plaintiff informed Jenkins that she knew that Jenkins and Basich were having a sexual relationship, and that she knew the couple were having sex on company property during operating hours. Pl.'s Compl. ¶20.   Plaintiff offered this information as a reason why Basich may have exaggerated or even fabricated what he overheard. Id.

Verizon contends that Plaintiff called out sick the next day, September 1, 2005. Verizon's SOF ¶21.   However, Plaintiff alleges that Lafferty advised her to not to return to work on September 1 given Plaintiff's mental state. Pl.'s Compl. ¶26.  Subsequently, Plaintiff was placed on leave for the next month. Verizon's SOF ¶ 21. When Plaintiff returned on November 1, 2005, Verizon terminated her employment, citing the Company's Code of Business Conduct which provides that "employees who violate company standards may be disciplined up to and including dismissal." Id. ¶22. Specifically, Verzion cited Plaintiff's use of a racial slur in the workplace and Plaintiff's failure to tell the truth during her investigative interview.  Immediately thereafter, the CWA filed a grievance on Plaintiff's behalf over her discharge.  The grievance was filed in accordance with the three-step Grievance Procedure contained in the CBA. CWA's Statement of Undisputed Material Facts Pursuant to L. R. Civ. P. 56.1 ("CWA's SOF") ¶5.   Verizon

maintained that Plaintiff's discharge was appropriate.

On November 2, 2005, Lafferty signed a Request for Records pertaining to the grievance filed on behalf of Plaintiff.  Rogers Certif., Exh. 23, Request for Records.  The request also asked Verizon to produce certain documents, including Plaintiff's individual attendance report, Plaintiff's absence and tardiness calender, records of discussions in reference to Plaintiff's dismissal, any documentation pertinent to Plaintiff's dismissal, and all documents with respect to the investigation of Plaintiff. Id.  Verizon complied with the CWA's request, providing the CWA with the date of the original complaint made against Plaintiff, all documents in the personnel files of employees that relate to the investigation, the Performance Documentation Form for Plaintiff's dismissal, the Employee Contact Memorandum that informed Plaintiff of her termination, an Exit Interview Form for Plaintiff, Plaintiff's Individual Attendance Report, Plaintiff's 2005 Absence and Tardiness Record and 2004 Associate Performance Appraisal Plan. Id.

On December 28, 2005, Plaintiff requested that Verizon reinstate her employment, contending that her termination was premised on inaccurate accounts of what she actually said during her conversation with Jones. Pl.'s Compl. ¶28.   However, Verizon refused to do so.  On April 26, 2006, the CWA notified Verizon that it intended to arbitrate Plaintiff's discharge.  Rogers Certif., Exh. 22.  Plaintiff alleges that the CWA did not inform her that it would proceed with a grievance until June 2006.  According to Plaintiff, the CWA delayed in proceeding with a grievance because Verizon did not timely produce copies of witness statements.  Pl.'s Compl. ¶30.

Once the CWA decided to pursue an arbitration hearing, the CWA appointed Elaine Waller, a CWA Staff Representative, to represent Plaintiff.  Certification of Elaine Waller ("Waller

Certif.") ¶5.   Plaintiff has produced numerous emails and other letters that she sent Waller, including a letter dated November 14, 2006, in which Plaintiff objected to the continued participation of Lafferty in the matter. Certification of Rita Morgan ("Morgan Certif."), Exh. I. Additionally, Plaintiff told Waller that Jones would be willing to cooperate and speak with CWA officials about the incident, but was unwilling to speak with Lafferty or any other CWA officials located in Hamilton.  Id.  Plaintiff has also produced other correspondences with Waller in which Plaintiff provided the names of numerous witnesses and issues to explore in preparation for the arbitration.  Morgan Certif., Exh. J.  Plaintiff claims Waller did not follow up on any of these potential leads.

On January 18, 2007, Waller sent out a number of letters to the following individuals inquiring as to whether they would be willing to speak with the CWA regarding Plaintiff's case: Evans, Monique Lomax, Basich, Bennett, Jones, Eileen Monihan, Mary Langfeld, and Lopresti. Waller Certif. ¶18.  On March 12, 2007, Waller sent Lori Kirschner, a member of Verizon's Labor Relations Department, an email requesting information related to Plaintiff's discharge. Rogers Certif., Exh. 24. Of those contacted to testify, only Langfeld and Lopresti contacted Waller.  Pinarski Certif., Exh. D, p. 98:14-15.   Waller also contacted Richard Speiler, an IBEW Business Agent, to provide testimony in support of Plaintiff's case.  Id. p. 98:16-20. In addition to these inquiries, Waller met with Plaintiff numerous times to discuss her case, including September 29, 2006, March 8, 2007, March 20, 2007, and April 23, 2007. Waller Certif. ¶¶ 16, 22, 25, 28. On April 3, 2007, CWA official Pat Niven contacted Joseph Gimilaro, Area Executive Director of Labor Relations for Verizon, asking for copies of the statements that Verizon used in its decision to terminate Plaintiff. Rogers Certif., Exh. 25.  Waller also sought

more documentation in preparation of Plaintiff's case.  For instance, on April 4, 2007, Waller

contacted Kirschner again seeking witness statements only to be informed by Kirschner that

Verizon would not provide this documentation because Verizon claimed it was not legally

required to produce it.  Rogers Certif., Exh. 27.  However, Waller was able to secure copies of

Plaintiff's performance appraisals, her work schedule, and a copy of the coaching discussion

between Walker and Evans. Rogers Certif., Exhs. 25, 26.

On April 26, 2007, Arbitrator Carol A. Wittenberg ("Arbitrator") heard the first day of

testimony.  On behalf of Verizon, Kelly, Congleton, and Jenkins testified. See Pinarski Certif.,

Exh. A, Transcript of Arbitration Hearing.  Waller cross-examined each of these witnesses and

took notes during their direct-examination.  Id.  Jenkins testified that she interviewed three

employees, Jones, Benett, and Basich, who each heard Plaintiff use a racial slur to refer to

Walker.  Id. pp. 61-63; 66.  The next day, Plaintiff sent an email to Waller thanking her for her

work the day before at the hearing, and informing Waller that she was "busy working on getting a

lot of info on paper" so that they could finish preparing her direct examination. Pinarski Certif.,

Exh. D., Deposition of Rita Morgan, p. 158.  On May 4, 2007, Plaintiff sent Waller a letter with

several attachments, one entitled "My Apology."  Id. pp.129-131.  Plaintiff admits she did indeed

craft the letter, in which she admitted to referring to Walker as a "real nigger" but only upon the

directive of Waller and others at the CWA who informed her that she could not win her

arbitration case unless she admitted to wrongdoing.  Id. pp. 136-138.  The CWA contacted

Plaintiff and arranged additional preparation meetings on May 22, June 14, and August 10, 2007.

Waller Certif. ¶37.  In addition to these meetings, Waller and Plaintiff exchanged numerous sets

of questions and responses in preparation for Plaintiff's direct examination. Pinarski Certif., Exh.

D., pp. 155-58.  Despite these submissions, Plaintiff paints a very different picture of the quality of Waller's representation.  Indeed, Plaintiff alleges that Waller was completely unfamiliar with the case, notably the who, what, where, and when of the alleged incident and the subsequent investigation.  Pl.'s Compl. ¶39.

During the second day of testimony, August 14, 2007, Verizon presented four witnesses, Basich, Jones, Bennett, and Walker.  Basich and Bennett both testified that they heard Plaintiff use the phrase "She is a real nigger."  Jones, too, testified that she thought she heard Plaintiff use the word "nigger" and that it was Jones' assumption that Plaintiff used the word to refer to Walker.  Again, Waller cross-examined all four witnesses. Pinarski Certif., Exh. A, pp. 104-142. In support of Plaintiff's case, Waller called five witnesses, Speiler, Kessell, Langfeld, LoPresti, and Morgan.  Morgan testified that on August 12, 2005, she did refer to Walker as a "real nigger," apologized, and asked to be reinstated.  Id. p. 239. After Plaintiff's testimony, Waller made an oral closing statement where she reiterated that Verizon did not have just cause to terminate Plaintiff and that Plaintiff's outburst was an isolated incident.  Id. pp. 270-79.  On September 24, 2007, the Arbitrator issued a written decision in Plaintiff's arbitration case, upholding Verizon's termination.  Rogers Certif, Exh. 33, Arbitration Decision.  On October 9, 2007, Plaintiff filed an Unfair Labor Practice Charge with the National Labor Relations Board ("NLRB"), alleging that CWA breached its duty of fair representation. Pinarski Certif., Exh. F, NLRB Complaint.  The Board summarily dismissed Plaintiff's charge in its entirety as without merit.[1]  Id.

---

[1]Although not raised by the parties in their papers, this Court is required to give preclusive effect to those administrative agency decisions rendered in a judicial capacity.  Durko v. OI-Neg TV Products, 870 F. Supp. 1278 (M.D. Pa. 1994); Pygatt v. Painters' Local No. 277,

On January 9, 2008, Plaintiff filed this Complaint in New Jersey Superior Court, Chancery

Division, Mercer County Vicinage.  Subsequently, Verizon filed a Notice of Removal pursuant to

28 U.S.C. §1441 on January 14, 2008.  Verizon asserted that jurisdiction was proper pursuant to

28 U.S.C. §1332(a) because Plaintiff's Complaint alleged violations of § 301 of the LMRA, and

thus raised a federal question. On February 4, 2008, Verizon filed its Answer to Plaintiff's

Complaint.  CWA filed its Answer on February 29, 2008.  On August 8, 2008, all three parties to

this case filed Motions for Summary Judgment.  For the reasons that follow, CWA and Verizon's

Motions for Summary Judgment are granted, and Plaintiff's Motion is denied.

## II. DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate where the Court is satisfied "there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 330 (1986). A fact is "material"

only if it might affect the outcome of the suit under the applicable rule of law.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will

not preclude a grant of summary judgment.  Id. The burden of establishing that no "genuine

---

763 F. Supp. 1301, 1307 (D.N.J. 1991). However, the NLRB does not act in a judicial capacity
when, after conducting an administrative investigation, it declines to pursue charges.  Black v.
Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 586 (6th Cir. 1994) (noting that "other circuits have
uniformly rejected the suggestion that an NLRB decision that did not result from an adjudicatory
hearing should be given preclusive effect.") (citation omitted).  Here, Plaintiff was not provided
with an opportunity to present witnesses, legal briefs, or evidence in support of her initial
complaint to the NLRB; the decision not to proceed with disciplinary charges was not the result
of an adjudicatory hearing.  See Durko, 870 F. Supp. at 1281-82.  Accordingly, the NLRB's
decision not to pursue an unfair labor practice charge against the CWA has no preclusive effect
in the case at bar.

issue" exists is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324.  In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248. In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party." Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (citations omitted).

On cross-motions for summary judgment, the Court may resolve the motions concurrently. See Assicurazioni Generali, S.P.A. v. Pub. Svc. Mut. Ins. Co., 77 F.3d 731, 733 & n. 2 (3d Cir.1996); 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed.1998). When doing so, the Court must view the evidence presented in a light most favorable to the non-moving party with respect to each motion. Fed. R. Civ. P. 56; Levy v. Sterling Holding Co., LLC, 475 F. Supp. 2d 463 (D. Del. 2007).

**B. Hybrid § 301 Claims under the Labor Management Relations Act**

At the outset, the Court notes that Defendants properly characterize Plaintiff's Complaint as an hybrid § 301 claim under the LMRA.  Although Plaintiff's Complaint does not specifically

plead violations of § 301, her claims are of two categories: (1) alleging a failure on the part of

CWA to properly represent her; and (2) Verizon's alleged breach of the CBA when it terminated

her employment.  In turn, Plaintiff does not dispute that § 301 is applicable, stating in her moving

papers that she is claiming wrongful termination against Verizon, and has cited to the relevant

case law in support of her Motion.

Essentially, a hybrid § 301 claim contains two causes of action inextricably intertwined

with the other: (1) the union's alleged breach of its duty of fair representation; and (2) the

employer's alleged breach of the collective bargaining agreement.  Vacas v. Sipes, 386 U.S. 171,

184 (1967).  In DelCostello v. Int'l. Brotherhood of Teamsters, 462 U.S. 151 (1983),[2] the

Supreme Court explained:

> Such a suit, as a formal matter, comprises two causes of action. The suit
> against the employer rests on [LMRA] § 301, since the employee is alleging a
> breach of the collective bargaining agreement. The suit against the union is
> one for breach of the union's duty of fair representation, which is implied
> under the scheme of the National Labor Relations Act. Yet the two claims are
> inextricably interdependent. To prevail against either the company or the
> Union, ... [employee-plaintiffs] must not only show that their discharge was
> contrary to the contract but must also carry the burden of demonstrating a
> breach of duty by the Union.

DelCostello, 462 U.S. at 164-65 (quoting United Parcel Services v. Mitchell, 451 U.S. 56, 66-67

(1981)).

---

[2]In DelCostello, the Supreme Court held, inter alia, that the six-month statute of
limitations under §10(b) of the National Labor Relations Act applies to hybrid 301 claims. As a
result, many hybrid 301 claims are dismissed as time-barred under the statute of limitations. See
e.g., Albright v. Virtue, 273 F.3d 564, 576 (3d Cir. 2001); Pagano v. Bell Atlantic-New Jersey,
988 F. Supp. 841 (D.N.J. 1997).  Here, however, Plaintiff timely brought suit in New Jersey
Superior Court, and as such, the statute of limitations does not bar Plaintiff's claims.

To prevail on a hybrid § 301 claim, an employee-plaintiff must first demonstrate the union's breach of the duty of fair representation before a court may reach the second inquiry, whether the employee-plaintiff was wrongfully discharged under the parties' CBA.  <u>See</u>, <u>e.g.</u>, <u>Mitchell</u>, 451 U.S. at 62 ("the indispensable predicate ... is ... a demonstration that the Union breached its duty of fair representation."); <u>Vadino v. A. Valey Engineers</u>, 903 F.2d 253, 261 (3d Cir.1990); <u>Kavowras v. New York Times Co.</u>, 132 Fed.Appx. 381, 383 (2d Cir. 2005). In other words, "[a] breach of the duty of fair representation claim is a 'necessary condition precedent' to the [ ] claim [against the employer] in hybrid suits where the employee sues both the employer and the union." <u>Albright v. Virtue</u>, 273 F.3d 564, 576 (3d Cir. 2001).

Here, the Court will first consider whether the CWA's representation of Plaintiff with regard to her dismissal and arbitration hearing satisfies its duty of fair representation under the NLRA.  Because the Court finds that the CWA did not breach its duty, the Court need not reach the merits of Plaintiff's wrongful termination claim against Verizon.

### C. Plaintiff's Duty of Fair Representation Claim - - Waller's Preparation and Performance During the Hearing

Turning to Plaintiff's Duty of Fair Representation Claim against the CWA, Plaintiff alleges that the CWA's handling of her termination grievance and subsequent arbitration was grossly inadequate.  Specifically, Plaintiff alleges that the CWA, through Waller, Lafferty, and unnamed others: (1) failed to call crucial witnesses to testify on Plaintiff's behalf; (2) forced Plaintiff to lie at the arbitration hearing by apologetically admitting she referred to Walker as a "nigger;" (3) failed to submit a written brief at closing of the arbitration hearing on Plaintiff's behalf; (4) failed to pursue certain lines of questioning with Verizon's witnesses on cross-

examination, including but not limited to ulterior motives in testifying that Plaintiff referred to

Walker as a "nigger"; and (5) failed to guide Plaintiff through the grievance process.   In

response, the CWA argues that it vigorously advocated on Plaintiff's behalf, and that any

disagreement over strategy at the arbitration does not rise to the level of bad faith, discrimination,

or arbitrary conduct.   Moreover, the CWA contests Plaintiff's declaration that Waller "forced"

Plaintiff to lie, directing this Court's attention to Plaintiff's correspondences with Waller where

Plaintiff drafted several versions of her "apology," admitting to referring to Walker as a "real

nigger."[3]

---

[3]Although Plaintiff disputes that she did no more than repeat Evans' use of the word
"nigger," nonetheless Plaintiff argues, in the alternative, that even if she did refer to Walker as a
"real nigger," such a slur would not justify her dismissal. Her feeble justifications fall short. The
word "nigger" persists as an ugly vestige of racial intolerance, bigotry, and brutality; its use in
any setting is inappropriate and indefensible. Against the backdrop of this country's mixed
history of race relations, Plaintiff insists that the word "nigger" is no more offensive than the
infamous lexicon satirized in the late, great George Carlin's "Seven Dirty Words You Can Never
Say on Television" monologue.  However, the Court is unable to identify any word in Mr.
Carlin's routine so charged with insidious racism and vitriol as the word "nigger." Indeed,
glaringly absent from the entomology of Mr. Carlin's "Seven Dirty Words" are images of
burning crosses, Jim Crow laws, and segregated buses. In McGinest v. GTE Service Corp., 360
F.3d 1103, 1116 (9th Cir. 2004), the Ninth Circuit highlighted the striking and obvious
differences between the word "nigger" and other offensive words:

> It is beyond question that the use of the word "nigger" is highly offensive and
> demeaning, evoking a history of racial violence, brutality, and subordination. This
> word is "perhaps the most offensive and inflammatory racial slur in English, ... a
> word expressive of racial hatred and bigotry." Swinton v. Potomac Corp., 270
> F.3d 794, 817 (9th Cir. 2001) (ellipsis in original) (quotation marks omitted); see
> also Daso v. The Grafton School, Inc., 181 F. Supp. 2d 485, 493 (D.Md. 2002)
> ("The word 'nigger' is more than [a]' mere offensive utterance'.... No word in the
> English language is as odious or loaded with as terrible a history."); NLRB v.
> Foundry Div. of Alcon Indus., Inc., 260 F.3d 631, 635 n. 5 (6th Cir. 2001) ("That
> the word 'nigger' is a slur is not debatable."). "Perhaps no single act can more
> quickly alter the conditions of employment and create an abusive working
> environment than the use of an unambiguously racial epithet such as 'nigger' by a
> supervisor in the presence of his subordinates." Rodgers v. Western-Southern Life

A union breaches it statutory duty of fair representation to employee-members when its actions are arbitrary, discriminatory, or taken in bad faith.  Vacas, 386 U.S. at 190.  The Third Circuit has elaborated on what conduct runs afoul of the union's duty of fair representation while underscoring the fundamental importance of the union's status as the exclusive bargaining agent:

> It is a fundamental axiom of federal labor law that a union's status as the exclusive bargaining representative of an employee carries with it a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.... [A] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. In the context of a grievance proceeding, the rule is that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion. While the application of the "perfunctory" standard has proven difficult over time, we have recently made clear that whatever it may mean in other circumstances, mere ineptitude or negligence in the presentation of a grievance by a union has almost uniformly been rejected as the type of conduct intended to be included within the term "perfunctory." What is required is a showing of actual bad faith or arbitrary conduct.

Riley v. Letter Carriers Local, 668 F.2d 224, 228 (3d Cir.1981) (internal citations omitted).  In other words, "[t] he fact that trained counsel would have avoided the error or pursued a different strategy is not enough." Id.  As a result, unions have wide latitude in their handling of a member's arbitration grievance.  Indeed, the duty of fair representation does not entitle an employee to have his grievance taken to arbitration; rather, the duty only requires the union to process the employee's proposed grievance in a non-arbitrary, non-discriminatory manner, even

_____

Ins. Co., 12 F.3d 668, 675 (7th Cir.1993) (citations and internal quotation marks omitted).

In sum, the Court agrees with the Ninth Circuit's assessment, and finds Plaintiff's rationalization of her alleged conduct both disturbing and insensitive.  In doing so, the Court makes no findings as to the appropriateness of Evans' punishment, nor must this Court determine whether Plaintiff's termination was appropriate, but rather only comments on Plaintiff's argument that the use of the word "nigger" is no worse than a four-letter word.

if hindsight later reveals there is merit to the employee's claims. <u>Bazarte v. United Transportation Union</u>, 429 F.2d 868, 872 (3d Cir.1970) (finding that it is "essential to plaintiff's claim that there should have been proof of arbitrary or bad-faith conduct on the part of the Union in processing his grievance"); <u>Findley v. Jones Motor Freight</u>, 639 F.2d 953, 959 (3d Cir. 1981); <u>Pagano v. Bell Atlantic-New Jersey</u>, 988 F.Supp. 841, 845 (D.N.J. 1997); <u>Fajardo v. Foodtown Supermarkets</u>, 702 F.Supp. 502, 506 (D.N.J.1988).

In <u>Air Line Pilots Ass'n Int'l v. O'Neill</u>, 499 U.S. 65, 67 (1991), the Supreme Court defined what conduct falls below the "arbitrary" threshold: "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness as to be irrational." <u>See</u> <u>Marquez v. Screen Actors Guild, Inc.</u>, 525 U.S. 33, 44 (1998) (holding that discretionary actions taken by the union on a member's behalf are not arbitrary even where the member can demonstrate they were "erroneous or unsuccessful."). Thus, decisions made in the processing of a grievance or during an arbitration hearing that later prove detrimental or fatal to a member's case are not arbitrary <u>per se</u>. <u>Bellesfield v. RCA Communications</u>, 675 F. Supp. 952, 955-56 (D.N.J. 1987).

Similarly, a claim of bad faith requires a plaintiff to make two showings: (1) the union and its representatives harbored animosity towards the employee; and (2) that animosity manifested itself as a material factor in the union's handling of the employee's grievance. <u>Maskin v. United Steel Workers of America</u>, 136 F. Supp. 3d 375, 382 (W.D. Pa. 2000) ("If the union representative was shown to be hostile to the plaintiff and his decisions about the grievance were influenced by his hostility rather than by appropriate considerations, it would be clear that the union breached its duty of fair representation."); <u>Hagans v. Budd Co.</u>, 597 F. Supp.

89 (E.D. Pa. 1984) (finding that the union did not act in bad faith where no evidence of hostility towards the employee-plaintiff was presented).

In order for Plaintiff to prevail on her claim, she must demonstrate that the CWA's actions were arbitrary, taken in bad faith, or discriminatory.[4] Here, the record is replete with actions taken by Waller and the CWA to put forth a viable case for the Plaintiff's arbitration hearing and thus, amply demonstrate that the CWA did not dispense with Plaintiff's case in a perfunctory fashion. For instance, Waller conducted a thorough and extensive cross-examination of Verizon's witnesses over the course of Plaintiff's arbitration hearing. See Pinarski Certif., Exh. A. Waller also met with CWA attorneys[5] to discuss possible strategies and met with Plaintiff on several occasions, including May 22, June 14, and August 10, 2007, to discuss her arbitration testimony and possible strategies. Waller Certif. ¶37.  In addition, Waller sought out witnesses to testify on Plaintiff's behalf, specifically Evans, Lomax, Basich, Bennett, Jones, Monihan, Langfeld, and Lopresti, a fact that controverts Plaintiff's contention that Waller did not attempt to secure witnesses to testify on Plaintiff's behalf.  It was not by any fault of Waller or CWA that many potential witnesses failed to respond to Waller's inquiry.   Even if this Court were to assume that Waller failed to reach out to certain witnesses, that decision, in and of itself,

_____

[4]The Court notes that in many instances, a breach of the duty of fair representation claim arises when a union fails to file a grievance or bring a grievance to arbitration.  Generally, the aggrieved employee alleges that the union failed to give adequate time to his grievance and dispensed with it in perfunctory fashion.  Here, the CWA methodically pursued Plaintiff's grievance, adhering to the routine three-step procedure and requesting documentation from Verizon in order to make an informed, reasoned decision.  These actions militate against any finding that the CWA processed Plaintiff's grievance in a perfunctory fashion.

[5]The record reveals that Waller is not an attorney but she did in fact meet with an unnamed attorney from the CWA to discuss Plaintiff's case. See Waller Certif. The Court will discuss in further detail the advice given by this attorney.  See infra.

16

is not arbitrary.  Indeed, in <u>Connell v. Merck and Co. Inc.</u>, a plaintiff sought relief from an arbitrator's decision to uphold his employment termination, alleging that his union attorney (1) failed to call certain witnesses to testify on the plaintiff's behalf; (2) advised the plaintiff not to testify; and (3) failed to use certain evidence during trial to cross-examine the employer's witnesses.  76 Fed.Appx. 438 (3d Cir. 2003).  In finding for the union, the Third Circuit held that although some of the union attorney's decisions may have backfired, the attorney's actions were not so far outside the range of reasonableness as to constitute arbitrary conduct.  <u>Id.</u>  Similarly, Plaintiff insisted that Waller proceed with certain questions and theories.  Also, Plaintiff challenges Waller's decision to present an oral, rather than a written, closing on the final day of arbitration.  Although Waller refused to explore some of these possible avenues of questioning[6] and submit a written closing argument to the Arbitrator, those disagreements do not rise to the level of violative conduct.  In fact, during the hearing, Verizon explored many of these questions on direct examination of its witnesses, giving the Arbitrator an opportunity to hear testimony on those issues.  <u>See</u> Pinarski Certif., Exh. A, pp. 103-04.  For instance, when cross-examining Basich, Waller asked whether Plaintiff was belligerent or angry when she was speaking to Jones, presumably to demonstrate that Plaintiff posed no risk to the safety of the other employees.  <u>Id.</u> pp. 105-08.  Instead of exhausting these issues, Waller decided that she would focus her cross-examination on other topics.  Even if this Court assumes that those decisions backfired and were detrimental to Plaintiff's case, that assumption does not permit this Court to find Waller's

---

[6]CWA contests Plaintiff's assertion that Waller did not cross-examine Jones on the issue of the use of racial slurs in the place.  Specifically, the CWA directs the Court's attention to Jones' cross-examination where she stated, in response to Waller's question about the use of racial slurs at Verizon, that "[i]t's a back and forth. . .like a social thing, or thinking it's funny."  Pinarski Certif., Exh. A, pp. 115-16.

conduct arbitrary.  In addition, Waller gave a thorough closing argument that highlighted

Plaintiff's tenure at Verizon and the severity of the punishment. Id. pp. 25-79.  The Court fails to

see how the submission of a written closing would have substantially altered the outcome.  These

tactical decisions are within the province of the union representatives, not to be second-guessed

based on hindsight.

Plaintiff also labels the CWA's inability to protect her during the investigation process or

to force Verizon to supply certain documentation, such as witness statements, as arbitrary

conduct. The Court, however, finds such assertions without merit.  First, the CWA attempted to

secure the witness statements only to be rebuffed by Verizon which maintained it was not

obligated to release those documents.[7]  Second, the CWA provided Plaintiff with representation

during her investigative interview with Jenkins and subsequently processed her grievance in

accordance with the CBA's explicit three-step grievance process.   Further, it was Plaintiff who

excused Lafferty during Plaintiff's interview with Jenkins.  In sum, the evidence belies Plaintiff's

claim that Waller was uninformed and uninterested in Plaintiff's case.  Rather, the record

indicates that Waller competently represented Plaintiff and did so in a manner consistent with the

CWA's explicit duty of fair representation.  Accordingly, the Court finds that the CWA did not

breach the duty of fair representation in its representation of Plaintiff during the arbitration

hearing.

### D. Plaintiff's Duty of Fair Representation Claims - - CWA Instructed her to Lie at the Arbitration Hearing

Plaintiff also alleges although she maintained throughout the grievance process that she

─────────────────────

[7]The Court notes that Verizon was not obligated to produce these statements. See infra Discussion Part E.

did not refer to Waller as a "real nigger," it was only upon the prompting and insistence of Waller that she "lied" during the arbitration hearing. As an initial matter, the CWA argues that this Court should not consider Plaintiff's Certification filed in support of her Complaint and Plaintiff's subsequent deposition testimony under the "sham affidavit" doctrine. Specifically, the CWA contends that Plaintiff's statements in support of her Complaint contradict her previous arbitration hearing testimony, and as such, are inherently unreliable.

In Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007), the Third Circuit expounded on the sham affidavit doctrine:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant.

In other words, "[w]hen. . .the affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a genuine issue of material fact." Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988) (finding that a court's disposition of summary judgment motions would be "seriously impaired" if it could not strike contradictory affidavits proffered by a non-movant to survive the summary judgment motion). Although some courts have adopted rather rigid guidelines when dealing with inherently contradictory affidavits, see, e.g., Buckner v. Sam's Club, Inc., 75 F.3d 290, 292-93 (7th Cir.1996), the Third Circuit has maintained a more flexible, case-by-case approach. Jiminez, 503 F.3d at 253. Thus, the Third Circuit has recognized an

19

exception to the sham affidavit doctrine in cases where the affiant offers a satisfactory explanation for the discrepancy.  Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir.1991).

The Court rejects the CWA's contention that Plaintiff's subsequent affidavit and deposition testimony should be disregarded under the sham affidavit doctrine.  First, a sham affidavit is normally one introduced for the sole purpose of defeating a summary judgment motion and contradicts an earlier position taken by the affiant in the same litigation. For instance, in Stukes v. AFSCME Local 2187, a case cited by the CWA, the plaintiff stated during a deposition that the defendant never said anything racially charged to her. No. 05-4065, 2007 WL 2823653 (E.D. Pa. Sept. 26, 2007).  Nevertheless, on the defendant's motion for summary judgment, the plaintiff proffered an affidavit in which she stated that the defendant did in fact make five racially derogatory statements directed towards her at various times.  Id.  In explaining the contradiction, the plaintiff averred that her counsel instructed her during the deposition not to answer any direct questions about any racially derogatory statements made by the defendant. In disregarding the plaintiff's subsequent affidavit, the court noted that such an explanation was insufficient and not meritorious.  Id.

Here, Plaintiff's original statement arises from arbitration testimony given before this litigation ensued, and the subsequent affidavit was offered before the CWA's Motion for Summary Judgment was filed.  Second, the gravamen of Plaintiff's claim against the CWA is that its representatives "forced" Plaintiff to lie at her arbitration testimony.  Obviously, Plaintiff's position during this litigation would be contrary to that arbitration hearing testimony given the nature of her Complaint.  Unlike Stukes, where the plaintiff changed her position for the purposes of surviving a motion for summary judgment, Plaintiff has consistently maintained

since the inception of this litigation that her arbitration testimony was the product of alleged breaches by the CWA of its duty of fair representation. Accordingly, the Court considers Plaintiff's explanation satisfactory and the sham affidavit doctrine inapplicable in the case at bar.

Nevertheless, even though the Court will consider Plaintiff's deposition testimony and affidavit in support of her Complaint, Plaintiff proffers little else that demonstrates she did not receive adequate union representation during her arbitration proceeding. The record is devoid of any evidence that tends to show that Waller or any other CWA official acted in bad faith or arbitrarily when they advised Plaintiff to admit to making a racially derogatory statement towards her supervisor. In her moving papers, Plaintiff consistently refers to the CWA's actions as "forcing" or "requiring" her to lie under oath. However, Plaintiff neither alleges in her Complaint, nor does she present evidence, indicating that Waller or the CWA, for example, threatened to withdraw representation if Plaintiff did not lie, or similarly, threatened to not vigorously advocate for Plaintiff during the hearing if Plaintiff did not lie under oath. Plaintiff was free to accept or reject the advice offered by Waller and the CWA's legal officials. Instead, Plaintiff chose to accept this strategy based on the CWA's assurance and experiences in similar matters. Although this advice, in hindsight, may have yielded unfavorable results, that inquiry is not relevant to the present discussion. Rather, in a cause of action against a union for a breach of the duty of fair representation, a plaintiff-employee must allege something more than mere negligence or bad judgment; rather there must be an allegation of bad faith, arbitrariness or discrimination. Bellesfield v. RCA Communications, 675 F. Supp. 952, 955-56 (D.N.J. 1987) ("[I]t is not enough for a member of the collective bargaining unit to show that the union

committed a mistake in the prosecution of a grievance, nor it is sufficient to show negligence or poor judgment on the union's part.") (citations omitted).

By contrast, in support of its motion, the CWA presents Plaintiff's correspondences, which show that Plaintiff, on her own accord, drafted an apology to be presented during her arbitration testimony. Pinarski Certif., Exh. D., Deposition of Rita Morgan pp. 129-31; Waller Certif. ¶34. In addition, Plaintiff testified that the apology was drafted by her and that she agreed to the strategy after Waller advised her that it was the best course of action. Id. Given the circumstances, Waller and the unnamed CWA attorney believed that the Arbitrator would not believe Plaintiff's original denial when three other witnesses testified in some way to the contrary. Relying on their experiences in previous cases, Waller and the unnamed CWA attorney advised Plaintiff that admitting to the wrongdoing was the best course of action; this advice was based on relevant factors and the circumstances of Plaintiff's case. Plaintiff and the CWA were in a precarious situation: (1) Plaintiff could maintain her story in the face of three witnesses who contradicted her denial; or (2) admit fault in the matter, apologize, and ask for reinstatement, arguing that the outburst was an isolated incident. The Court does not envy this predicament. Nevertheless, the CWA advice and strategy was reasonable, given Verizon's strong evidence in support of its decision to fire Plaintiff, and as such, far from arbitrary.

Moreover, a finding of bad faith would require Plaintiff to demonstrate animosity, something absent from the record.[8] Indeed, nothing in the record reveals that CWA or Waller

_____

[8]Plaintiff also alleges that the CWA failed to zealously advocate for her during the arbitration due to its conflicting interests in protecting other bargaining unit employees. Specifically, Plaintiff's Complaint alleges that "CWA failed to properly and zealously represent the Plaintiff by taking into consideration the union members as a group and refusing to harm any other union member in its attempt to represent the Plaintiff." Pl.'s Compl. ¶55. Again, these

were nefariously or perniciously motivated.  For instance, the Complaint states that "Ms. Waller advised [Plaintiff] that she guaranteed they would lose if she did not change her story, apologize for making the statement and throw herself on the mercy of the arbitrator."  Pl.'s Compl. ¶42.  In her moving and opposition papers, Plaintiff does not assert that the CWA or Waller in particular, harbored any resentment or animosity towards Plaintiff.  To the contrary, Plaintiff thanked Waller via email for all her efforts after the first day of testimony in the arbitration hearing. Pinarski Certif., Exh. D, Deposition of Rita Morgan, p. 158:2-8.

Plaintiff also argues that instructing or advising Plaintiff to lie constitutes a lack of "good faith," and as such, is representation rendered in bad faith.  Although this argument, on the surface, may seem logically sound, it is a clear misapplication of the current case law.   Plaintiff has not offered any evidence that proves Waller or the CWA acted in bad faith, i.e. pursuant to improper, antagonistic motives, and as a result, that animus substantially impacted its representation of Plaintiff.  Without that showing, Plaintiff's claim must fail.  In turn, the CWA provides a voluminous record, replete with evidence demonstrating Waller's efforts in the case. What the record does not reveal is any indicia of arbitrariness, bad faith or discriminatory purpose.   Accordingly, the Court finds that CWA did not breach its duty of fair representation and the  CWA's Motion for Summary Judgment is granted.

---

allegations are without merit.   For instance, Plaintiff's contention that CWA did not adequately explore the issue of whether other Verizon employees were using racial slurs in the workplace is controverted by Waller's cross-examination of Jones, where she asks, among other things, whether Jones was subject to racial slurs being used by other Verizon employees.  See supra n. 6. Notwithstanding, Plaintiff attempts to cast Waller's decision to not question every witness on the issue of racial slurs in the workplace as motivated by the CWA's desire to insulate other CWA members from punishment for using such offensive language.  The record, however, does not support such a finding, and a tactical decision with regards to possible avenues of questioning is subject to great deference.  See supra.  As such, the Court rejects this argument.

23

**E. Verizon's Motion for Summary Judgment**

**a. Verizon's Alleged Failure to Disclose Witness Statements**

Plaintiff alleges that Verizon failed to provide the CWA with the witness statements of its witnesses and the notes from Jenkins' meeting with witnesses, and as such, failed to provide the CWA with relevant information needed to perform its duties as Plaintiff's bargaining representative. In response, Verizon contends that it is not obligated to honor requests for witness statements or notes from those interviews.

Under Section 8(a)(5) of the NLRA, employers are required to furnish unions with relevant information necessary to perform their duties as the employees' bargaining representative. Detroit Edison v. NLRB, 440 U.S. 301, 303 (1979). However, the duty on an employer to furnish all relevant information to the union is not boundless as the NLRB has carved out certain exceptions to this general rule. Specifically, the NLRB has held that the general duty to honor information requests is inapplicable to witness statements. Anheuser-Busch, Inc., 237 NLRB 982, 984 (1978); see also Boyertown Packaging Corp., 303 NLRB 441, 444 (1991). The NLRB has also held that an employer need not turn over notes of interviews conducted by an EEO manager, finding that the interest in protecting confidential information outweighed the union's need for the information. Northern Indiana Public Service Co., 347 NLRB No. 17, slip op. (2006).

Plaintiff concedes that Verizon is not obligated to produce witness statements under 8(a)(5). Nevertheless, Plaintiff contends that the CWA was delayed in processing Plaintiff's grievance because Verizon refused to comply with the CWA's information request and produce the witness statements. However, Plaintiff's position is untenable given the fact that Verizon

was not obligated to honor the CWA's request for witness statements in light of the rule in

Anheuser-Busch.  Plaintiff cites no case where an employer was obligated to produce a witness

statement, contrary to the NLRB's holding in Anheuser-Busch, on the basis that the union was

delayed in processing the employee's grievance.  Verizon complied in every other respect,

producing all of Plaintiff's employment records and other documents that were requested by the

CWA.  Plaintiff only identifies two document requests with which Verizon refused to comply:

(1) Jenkins' notes from her interviews; and (2) the witnesses' statements from those interviews.

Both requests, however, were rejected based on the principle that such production "would

diminish rather than foster the integrity of the grievance and arbitration process."  Anheuser-

Busch, 237 NLRB at 984. Thus, Verizon's refusal was justified given the precedent in Anheuser-

Busch.  Accordingly, Plaintiff's failure to disclose claim against Verizon is dismissed.

### b. Plaintiff's 301 claim against Verizon

Plaintiff also alleges that Verizon was in violation of the CBA when it wrongfully

terminated her employment.  However, given that "the indispensable predicate [in a hybrid 301

case] ... is ... a demonstration that the Union breached its duty of fair representation," Plaintiff's

claims against Verizon must be dismissed.  Mitchell, 451 U.S. at 62, overruled on other grounds,

DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983);

Vadino v. A. Valey Engineers, 903 F.2d 253, 261 (3d Cir.1990); Kavowras v. New York Times

Co., 132 Fed.Appx. 381, 383 (2d Cir. 2005); see also Adams v. Gould, Inc., 739 F.2d 858, 866

(3d Cir.1984) (the "general rule of labor law that members of a collective bargaining unit cannot

ordinarily sue individually to vindicate their rights under the collective bargaining agreement.")

Accordingly, Verizon's Motion for Summary Judgment is granted.

**III. CONCLUSION**

For the foregoing reasons, CWA and Verizon's Motions for Summary Judgment are granted.  Further, Plaintiff's Motion for Summary Judgment is denied.


Dated: March 17, 2009                                      s/ Freda L. Wolfson
                                                           **Freda L. Wolfson, U.S.D.J.**